IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,            )
                                     )
                Plaintiff,           )
                                     )
v.                                   )        Case No. 10-00166-01-CR-W-HFS
                                     )
GIOVANI CRISOLIS-GONZALEZ,           )
                                     )
                Defendant.           )

REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant's Motion to Suppress Evidence and Statements (doc #59). For the reasons set forth below, it is recommended that the motion be granted in part and denied in part.

I. BACKGROUND

On May 25, 2010, a criminal complaint was filed against defendant Giovani Crisolis-Gonzalez charging that on May 14, 2010, defendant knowingly possessed with intent to distribute methamphetamine.

On June 15, 2010, the Grand Jury returned a three-count indictment against defendant Crisolis-Gonzalez. On September 7, 2010, the Grand Jury returned a three-count superseding indictment against defendant. Count One of the superseding indictment charges that on May 14, 2010, defendant knowingly possessed with intent to distribute fifty grams or more of methamphetamine. Count Two charges that on May 14, 2010, defendant, then being an alien illegally and unlawfully in the United States, possessed in and affecting interstate commerce a firearm. Count Three charges that on May 14, 2010, defendant, an alien, was found in the United States after having been removed therefrom on December 12, 2008, without having obtained the express consent of the Attorney General of the United States or his successor, the Secretary of Homeland Security, to reapply for admission to the United States.

An evidentiary hearing on the motion to suppress was held on December 8, 2011. Defendant

Crisolis-Gonzalez was represented by appointed counsel Melanie S. Morgan. The Government was represented by Assistant United States Attorney Patrick D. Daly. The Government called Special Agents Joseph Stewart and Jose Covarrubias of Homeland Security Investigations as witnesses. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Special Agent Jose Covarrubias was investigating a series of methamphetamine cases in St. Joseph, Missouri. (Tr. at 49) Special Agent Covarrubias had information from a confidential informant that Giovani Crisolis-Gonzalez was involved in the trafficking of methamphetamine. (Tr. at 49) Special Agent Covarrubias received information from the confidential informant that Crisolis-Gonzalez had moved and was now living at the Brittany Village Apartments. (Tr. at 50) Special Agent Covarrubias was given the address and the apartment number where Crisolis-Gonzalez was residing. (Tr. at 50) Special Agent Covarrubias was also informed by the confidential informant that Crisolis-Gonzalez had been inquiring about ammunition. (Tr. at 50) From this, Special Agent Covarrubias inferred that Crisolis-Gonzalez had a firearm. (Tr. at 50)

2. Special Agent Stewart testified that he had been briefed that a subject by the name of Giovani Crisolis-Gonzalez, who had illegally entered this country after previously being deported, was involved in the distribution or trafficking of narcotics. (Tr. at 7) On May 14, 2010, early in the morning, Special Agent Stewart and Special Agent Ben Gatrost were assigned to conduct surveillance at the apartment complex where Crisolis-Gonzalez was believed to be staying. (Tr. at 5-6, 51) The agents did not see Crisolis-Gonzalez during their surveillance, but they did locate a vehicle that they thought may belong to Crisolis-Gonzalez. (Tr. at 6)

3. Special Agents Covarrubias and Jason Poniatowski arrived at the Brittany Village Apartments and the decision was made to approach the apartment for a knock and talk to try and locate Mr. Crisolis-Gonzalez. (Tr. at 6-8, 51) At approximately, 1:30 p.m., Special Agents Covarrubias, Poniatowski, Stewart and Gatrost all assembled in front of the door to the apartment where they believed Crisolis-Gonzalez would be found. (Tr. at 8, 10, 51-52, 75) Special Agent Covarrubias knocked on the door. (Tr. at 10, 52) The door was opened by a Hispanic gentleman later identified as Mr. Reyes-Savedra. (Tr. at 10, 52) Special Agent Covarrubias began speaking to Reyes-Savedra in Spanish. (Tr. at 11, 52) Special Agent Stewart testified that Special Agent Covarrubias held up his credentials and explained who he was. (Tr. at 11) Special Agent Covarrubias testified that he identified himself, showed Reyes-Savedra his credentials and badge and asked if the agents could enter the apartment to talk to him. (Tr. at 52) Reyes-Savedra said they could come in, moved sideways and let the door open wider and the agents entered the apartment. (Tr. at 11, 52-53, 74) The agents later determined that Reyes-Savedra was the boyfriend of Ms. Francisca Solano-de Ramirez, the person on the lease to the apartment. (Tr. at 53)

2

4.     Upon entering the apartment, Special Agent Stewart testified that Mr. Reyes-Savedra was to the right of the agents in a living room area. (Tr. at 11) To the agents' left was a kitchen area where Special Agent Stewart saw a woman, later identified as Mr. Crisolis-Gonzalez' girlfriend, Yuliet Lara, and baby. (Tr. at 11-12, 62) Special Agent Covarrubias asked Reyes-Savedra and Lara if there were any other people in the apartment. (Tr. at 13, 53) Neither Reyes-Savedra nor Lara responded. (Tr. at 53) Special Agent Covarrubias asked again if there was anyone else in the apartment. (Tr. at 53) Special Agent Stewart testified that Reyes-Savedra paused and turned slightly and looked down a hallway. (Tr. at 13) Special Agent Stewart took this to mean that he "knows there's something, but he doesn't want to say it." (Tr. at 13) Special Agent Covarrubias testified that Reyes-Savedra nodded his head like, yes, there was, but did not indicate where. (Tr. at 53)

5.     At that point, Special Agent Covarrubias informed Mr. Reyes-Savedra and Ms. Lara that the agents were going to check the apartment for people. (Tr. at 54) Special Agents Covarrubias and Poniatowski began walking towards the hallway to conduct a security sweep. (Tr. at 13, 54) Special Agent Stewart testified that based on their information that there were possibly drugs in the apartment and given his experience that drug dealers oftentimes have weapons and the fact that they had information that Mr. Crisolis-Gonzalez had been inquiring about handgun rounds, he was uneasy. (Tr. at 16) Special Agents Stewart and Gatrost stayed near the front of the apartment with Reyes-Savedra and Lara. (Tr. at 13) As they got to the hallway, Special Agents Covarrubias and Poniatowski announced their presence by stating loudly, "Police, Police," as several doors were closed down the hallway. (Tr. at 13-14, 54-55) Special Agent Covarrubias testified that his gun was drawn given the information that Crisolis-Gonzalez was engaged in the trafficking of narcotics and that usually guns are involved with that. (Tr. at 55) Almost immediately, a door at the back of the hallway opened and Crisolis-Gonzalez came out of a bedroom. (Tr. at 14, 56) Special Agent Covarrubias recognized Crisolis-Gonzalez and brought him to the front of the apartment. (Tr. at 14, 56) Special Agent Covarrubias asked the group if there was anybody else in the apartment and someone responded, "I don't know." (Tr. at 56) Crisolis-Gonzalez was handcuffed. (Tr. at 56, 79-80) Reyes-Savedra was handcuffed as well. (Tr. at 36) Special Agents Covarrubias and Poniatowski continued the security sweep. (Tr. at 56) One other individual, Mr. Ocampo-Ocampo, was located in one of the bedrooms and was brought to the front area. (Tr. at 14, 56) He was also handcuffed. (Tr. at 57) Ms. Lara was never handcuffed. (Tr. at 36)

6.     Special Agent Covarrubias moved everyone into the living room area and seated them on the furniture. (Tr. at 15, 57) Given that everything was secure and there were no other people in the apartment, the handcuffs were removed. (Tr. at 57) Special Agent Covarrubias testified that his gun was holstered. (Tr. at 57) Special Agent Covarrubias showed his credentials and badge again and explained who the agents were and why they were there. (Tr. at 15, 39, 58) Special Agent Covarrubias then asked each of the individuals for their name, where they were born and what their status was in this country. (Tr. at 77-78) The agents already knew that Mr. Crisolis-Gonzalez was in the country illegally and that he would be, at the very least, administratively arrested that day. (Tr. at 78-80) Crisolis-Gonzalez acknowledged that he was in the country illegally. (Tr. at 78) Special Agent Stewart testified that during administrative investigations, agents are not required to provide <u>Miranda</u> warnings before questioning an individual about removeability. (Tr. at 17-18) According to Special Agents Stewart and Covarrubias, the agents were purely at the

administrative level at this point and would continue as such until there was any evidence of a criminal infraction. (Tr. at 18, 38, 78) While an individual could be criminally prosecuted for illegally reentering the country after deportation, Special Agents Stewart and Covarrubias testified that the large majority are not prosecuted, unless there are other circumstances involved. (Tr. at 21-22, 80-81) The United States Attorney's Office makes the decision as to whether or not to prosecute after Homeland Security Investigations agents have compiled and completed the administrative portion of the case. (Tr. at 22, 81)

7.      Special Agent Covarrubias stated that the agents would like to do a consent search of the apartment. (Tr. at 15, 58) Mr. Crisolis-Gonzalez asked what the agents were looking for. (Tr. at 15, 58) Special Agent Covarrubias answered that they were looking for fraudulent documents, guns, large amounts of U.S. currency and narcotics. (Tr. at 15, 58) Crisolis-Gonzalez turned back towards the hallway and volunteered that he had a gun under his mattress. (Tr. at 15, 44, 58-59) Special Agent Covarrubias did not ask Crisolis-Gonzalez any questions about the gun. (Tr. at 59)

8.      Special Agents Gatrost and Poniatowski went back to the bedroom to make sure the gun was safe and not loaded. (Tr. at 16, 45) They left the gun there. (Tr. at 59) When they returned, Special Agent Covarrubias again asked for consent to search the apartment. (Tr. at 16, 59) Mr. Crisolis-Gonzalez asked what would happen if he did not give consent. (Tr. at 59) Special Agent Covarrubias explained that Crisolis-Gonzalez did not have to give consent, that it was completely voluntary, but that the agents would attempt to obtain a search warrant. (Tr. at 59, 82) Special Agent Covarrubias had a consent form written in Spanish that he read to everyone in Spanish. (Tr. at 16-17, 59-60) Crisolis-Gonzalez asked for the form so that he could read it himself and then agreed to give consent and signed the form at 1:45 p.m. (Tr. at 17, 60, 63-64; Government's Ex. 2) Ms. Lara also signed the consent form. (Tr. at 62, 64; Government's Ex. 2) Later, at 3:35 p.m., Crisolis-Gonzalez and Lara again signed the form consenting to a search of a vehicle. (Tr. at 62; Government's Ex. 2) At 4:01 p.m., Crisolis-Gonzalez and Lara signed a form consenting to the search of a laptop computer and mobile phones. (Tr. at 64-65; Government's Ex. 3)

9.      After Mr. Crisolis-Gonzalez and Ms. Lara signed the consent form for the apartment, their bedroom was searched by Special Agents Poniatowski and Gatrost. (Tr. at 66) A digital scale, plastic bags containing a white powder which tested positive for methamphetamine, a spoon with a crystal substance, a Social Security card in the name of Juan Alvarez which did not appear legitimate, the gun, currency, a box of plastic baggies, ammunition and a knife were recovered from the bedroom. (Tr. at 66-70)

10.     As soon as Special Agent Covarrubias was advised that narcotics had been recovered, he went back to the bedroom to take a look and then obtained a <u>Miranda</u> warnings form because he wanted to speak with Mr. Crisolis-Gonzalez about the drugs. (Tr. at 71, 84-85) Special Agent Covarrubias sat down with Crisolis-Gonzalez at the kitchen table and explained the <u>Miranda</u> warnings to him by reading him the form. (Tr. at 71; Government's Ex. 1) Crisolis-Gonzalez signed the <u>Miranda</u> warnings form and agreed to speak to Special Agent Covarrubias without a lawyer. (Tr. at 17, 72) However, Crisolis-Gonzalez said that he would rather wait and talk after he was taken away from the apartment when the other people were not around. (Tr. at 72) Special Agent Covarrubias did not tell Crisolis-Gonzalez how

4

many years he was facing. (Tr. at 86) Special Agent Covarrubias merely told Crisolis-Gonzalez that if he cooperated, the U.S. Attorney's Office would be informed of his cooperation. (Tr. at 86)

11. Mr. Reyes-Savedra and Mr. Ocampo-Ocampo initially denied consent to search their bedrooms. (Tr. at 64) They said their girlfriends with whom they shared the rooms were not present and they did not want to give consent without them being there. (Tr. at 64) After their girlfriends arrived, the agents approached Reyes-Savedra and Ocampo-Ocampo again and they all granted consent to search. (Tr. at 65; Government's Ex. 4)

12. At the conclusion of the search, Mr. Crisolis-Gonzalez was taken to the Platte County Jail. (Tr. at 72) Crisolis-Gonzalez was then re-advised of his Miranda rights and signed the form again. (Tr. at 72-73; Government's Ex. 1) Special Agent Covarrubias then spoke at length with Crisolis-Gonzalez about the drugs and the scope of the conspiracy. (Tr. at 73)

## III.  DISCUSSION

Defendant Crisolis-Gonzalez seeks to suppress all evidence and statements. Specifically, defendant argues:

- The agents lacked consent or lawful authority to be in defendant's home.

- Even if the agents had consent to enter, the encounter immediately became a coercive encounter.

- Defendant was entitled to Miranda warnings prior to being questioned about his identity and immigration status and the location of the firearm, drugs and money.

- Defendant's consent to search was not voluntary.

- Miranda warnings came after defendant had made incriminating statements and after defendant had been given false information by the agents.

- The statement defendant gave on May 17 or May 18 was involuntary because defendant had not been brought in front of a magistrate judge as required by statute.

The Court will address each of defendant's arguments.

A.  Entry Into the Apartment

The agents approached the door to the apartment for which they had information defendant Crisolis-Gonzalez was residing to conduct a knock and talk to try and locate Crisolis-Gonzalez. (See Fact Nos. 1 and 3, supra) The door was opened by a Hispanic gentleman. (See Fact No. 3, supra) Special Agent Covarrubias identified himself, showed his credentials and badge and asked

5

if the agents could enter the apartment to talk. (Id.) The Hispanic gentleman said they could come in, moved sideways and let the door open wider. (Id.) The Hispanic gentleman, later identified as Mr. Reyes-Savedra, was the boyfriend of the person on the lease to the apartment and shared a bedroom with her at the apartment. (See Fact Nos. 3 and 11, supra)

The Eighth Circuit has acknowledged that a "knock and talk"[1] is a reasonable investigative technique. See United States v. Weston, 443 F.3d 661, 667 (8th Cir.), cert. denied, 549 U.S. 956 (2006). While defendant argues that Mr. Reyes-Savedra was not authorized to open the door and give consent for the agents to enter the apartment, the Court finds that Mr. Reyes-Savedra had both actual and apparent authority to provide the agents with permission to enter. Valid consent may be given by a third party who possessed common authority over or other sufficient relationship to the premises. See United States v. Hilliard, 490 F.3d 635, 639 (8th Cir. 2007). Not only did Mr. Reyes-Savedra open the door after Special Agent Covarrubias knocked and tell the agents they could come in, appearing to have authority to allow their entry, he also lived in the apartment, sharing a bedroom with the person whose name was on the lease. There was nothing improper in the manner in which the agents gained access to the apartment.

B.     The Security Sweep

In Maryland v. Buie, 494 U.S. 325, 335 (1990), the Supreme Court held that a protective sweep in conjunction with an in-home arrest is permissible if it is a quick and limited search, conducted for the purpose of safety and narrowly confined to a cursory visual inspection of spaces where a person may be found. The Court stated:

> [T]he Fourth Amendment would permit [a] protective sweep ... if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others.

---

[1]A "knock and talk" is an investigatory technique in which law enforcement officers approach the door of a dwelling seeking voluntary conversation and consent to search. See United States v. Wise, 588 F.3d 531, 534 n.3 (8th Cir. 2009).

Id. at 327 (citations omitted).

The purpose of the knock and talk in this case was to locate defendant Crisolis-Gonzalez and, at the very least, administratively arrest him. (See Fact Nos. 3 and 6, supra) "Pursuant to 8 U.S.C. § 1357(a)(2), an officer of the 'Service' (Department of Homeland Security, ICE ...) is authorized to arrest any alien without a warrant if he has 'reason to believe' the alien is in the United States illegally." Douglas v. United States, 2011 WL 2471516, *6 (M.D. Fla. June 22, 2011). The agents knew that Crisolis-Gonzalez had illegally entered this country after previously being deported. (See Fact No. 2, supra) A confidential informant had provided the address and apartment number where Crisolis-Gonzalez was residing. (See Fact No. 1, supra) Crisolis-Gonzalez' vehicle was parked at the apartment complex. (See Fact No. 2, supra) Upon entry into the apartment, Special Agent Covarrubias inquired of Mr. Reyes-Savedra and Yuliet Lara whether others were present in the apartment. (See Fact No. 4, supra) Neither Mr. Reyes-Savedra nor Ms. Lara responded. (Id.) When Special Agent Covarrubias asked the question again, Mr. Reyes-Savedra motioned as if there were others, but did not want to say it. (Id.) Given this odd behavior and the information the agents had that Crisolis-Gonzalez was involved in the trafficking of methamphetamine and apparently possessed a firearm given his inquiries about ammunition, the agents felt it necessary to conduct a security sweep of the apartment. Given the circumstances, a reasonable agent could conclude that it was necessary for his safety to secure the premises. There was a reasonable possibility that other individuals were in the home, posing a danger to the agents.

The agents had not even opened a door to begin the security sweep when defendant Crisolis-Gonzalez opened a door at the back of the hallway and came out of a bedroom. (See Fact No. 5, supra) Special Agent Covarrubias recognized Crisolis-Gonzalez. (Id.) The security sweep continued. (Id.) One other individual, Mr. Ocampo-Ocampo, was located in another bedroom. (Id.) The security sweep was valid. See United States v. Wells, 2010 WL 126032, *6 (E.D. Mo. Jan. 7, 2010)("With probable cause to arrest the two individuals who stood just outside the door of the shop, [the officer] was authorized to perform a protective sweep of the shop, for his safety and that of his

7

fellow officers.  <u>Maryland v. Buie</u>, 494 U.S. 325, 337 (1990).")

      C.     <u>Questioning Prior to Miranda Warnings</u>

Prior to the administration of <u>Miranda</u> warnings, Special Agent Covarrubias asked each of the individuals found in the apartment for their name, where they were born and what their status was in this country.  (<u>See</u> Fact No. 6, <u>supra</u>)  Prior to any questioning, the agents knew defendant Crisolis-Gonzalez' identity, that he was in the country illegally and that he would be, at the very least, administratively arrested that day.  (<u>Id.</u>)  Crisolis-Gonzalez acknowledged that he was in the country illegally.  (<u>Id.</u>)  Special Agent Stewart testified that during administrative investigations, agents are not required to provide <u>Miranda</u> warnings before questioning an individual about removeability.  (<u>Id.</u>)  According to Special Agents Stewart and Covarrubias, the agents were purely at the administrative level at this point and would continue as such until there was any evidence of a criminal infraction.  (<u>Id.</u>)

"It is well-settled that routine biographical data is exempted from <u>Miranda</u>'s coverage."  <u>United States v. Brown</u>, 101 F.3d 1272, 1274 (8th Cir. 1996).  Thus, "[a] request for routine information necessary for basic identification purposes is not interrogation under <u>Miranda</u>."  <u>Id.</u> Special Agent Covarrubias was therefore justified in asking defendant to identify himself without first providing <u>Miranda</u> warnings.  However, Special Agent Covarrubias should not have asked defendant about his status in this country as he should have known this question was reasonably likely to elicit an incriminating response.  Contrary to the agents' understanding (<u>see</u> Fact No. 6, <u>supra</u>), the protection of <u>Miranda</u> applies to all custodial interrogations where criminal prosecutions could result, even if the interrogation is administrative in nature.  <u>See</u> <u>United States v. Torres-Lona</u>, 2006 WL 3254538, *11 (N.D. Iowa Nov. 9, 2006), <u>aff'd</u>, 491 F.3d 750 (8th Cir. 2007).  As set forth above, the agents knew that defendant Crisolis-Gonzalez was in the country illegally before the question was posed to him.  Criminal prosecution has resulted from Crisolis-Gonzalez being in this country illegally.  Thus, <u>Miranda</u> warnings should have been provided to defendant Crisolis-Gonzalez before he was asked about his status in this country.  Defendant's acknowledgment that

he was in the country illegally must be suppressed.

Contrary to defendant's argument, there was no questioning prior to <u>Miranda</u> warnings relating to guns, drugs or cash. Defendant Crisolis-Gonzalez volunteered that he had a gun under his mattress. (<u>See</u> Fact No. 7, <u>supra</u>) This statement was not in response to any question posed by the agents. Any statements made by defendant Crisolis-Gonzalez relating to drugs or cash came after defendant had been provided <u>Miranda</u> warnings. (<u>See</u> Fact Nos. 10 and 12, <u>supra</u>)

D.    <u>The Search of Defendant's Bedroom</u>

The Fourth Amendment protects the home from warrantless searches and seizures. <u>See United States v. Dunn</u>, 480 U.S. 294, 300 (1987). However, an exception to this protection occurs where proper consent has been voluntarily given. <u>See United States v. Matlock</u>, 415 U.S. 164, 165-66 (1974). The government bears the burden of proving that consent was voluntarily given. <u>See United States v. Willie</u>, 462 F.3d 892, 896 (8th Cir. 2006), <u>cert. denied</u>, 549 U.S. 1292 (2007). The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion. <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227 (1973). In <u>United States v. Willie</u>, the court set forth the following guidance in judging the voluntariness of a defendant's consent:

> Our case law offers a catalogue of factors to consider in judging the voluntariness of a defendant's consent to search. Some relate to the characteristics and behavior of the defendant, such as the defendant's age, intelligence and education, knowledge of his constitutional rights (whether from *Miranda* warnings in the encounter at issue or from previous interactions with police), whether he was under the influence of drugs or alcohol, and whether he objected to the search or stood by silently as it was occurring. ... Others relate to the environment surrounding the defendant at the time he gave his consent, such as whether he was in custody or under arrest and whether he was in a public or secluded place. ... Still others relate to the interaction between police and the defendant in the encounter, such as whether police officers detained and questioned the defendant for a long time before obtaining his consent, whether they threatened, physically intimidated, or punished him, and whether they made promises or misrepresentations upon which the defendant relied in giving his consent. ... No one factor is dispositive; they are merely tools for analyzing the "totality of all the circumstances." ...

462 F.3d at 896 (citations omitted).

In this case, when Special Agent Covarrubias asked for consent to search, defendant Crisolis-

9

Gonzalez asked what would happen if he did not consent and Special Agent Covarrubias responded that he did not have to give consent, it was completely voluntary, but that the agents would attempt to obtain a search warrant. (See Fact No. 8, supra) Special Agent Covarrubias then read a Consent to Search form written in Spanish to defendant Crisolis-Gonzalez, Yuliet Lara, Mr. Reyes-Savedra and Mr. Ocampo-Ocampo in Spanish. (Id.) Defendant Crisolis-Gonzalez asked for the form so that he could read it himself and then agreed to give consent and signed the form. (Id.) Although Special Agent Covarrubias was armed when he requested consent, his gun was holstered. (See Fact No. 6, supra) No evidence was presented to indicate that defendant did not understand what Special Agent Covarrubias was requesting. No evidence was presented to indicate that defendant was under the influence of alcohol or drugs. No evidence was presented to indicate that defendant was threatened nor that he was made any promises to secure his consent. No evidence was presented to indicate that defendant made any objections while the agents were searching his bedroom. At the time of the search, defendant was 26 years old. (See Superseding Indictment (doc #22)) Defendant signed the consent form at 1:45 p.m., just fifteen minutes after the agents had arrived at the apartment. (See Fact Nos. 3 and 8, supra). Defendant was detained, but not under arrest when he signed the consent. Mr. Reyes-Savedra and Mr. Ocampo-Ocampo initially declined to give consent to search their bedrooms (see Fact No. 11, supra), thus negating a coercive atmosphere.

Based on the evidence outlined above, the Court finds that defendant Crisolis-Gonzalez was not coerced by the agents, was aware of his right to refuse consent and was informed of his rights by Special Agent Covarrubias as well as by the consent form, which was in Spanish. Defendant's question as to what would happen if he did not consent evidenced the ability to intelligently consider his options. Defendant then voluntarily and intentionally waived his rights and consented to a search of his bedroom. The Government has met its burden in establishing that defendant's consent to search was freely and voluntarily given and not the result of duress or coercion.

E.    <u>Defendant's Statement</u>

An individual's waiver of his Fifth Amendment privilege against self-incrimination is valid

Case 4:10-cr-00166-DGK    Document 68    Filed 12/20/11    Page 10 of 13

only if the waiver is made voluntarily, knowingly and intelligently.  See Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Harper, 466 F.3d 634, 643 (8th Cir. 2006), cert. denied, 549 U.S. 1273 (2007).  The Eighth Circuit Court of Appeals has set forth the following guidance in a case with language barriers in determining whether an individual's waiver was done knowingly, intelligently and voluntarily:

> ... In Miranda, the Court held that police officers must inform a suspect of his Fifth Amendment privilege against self-incrimination prior to initiating a custodial interrogation.  A suspect may then waive these rights provided that the waiver is knowing, voluntary, and intelligent. .... A waiver is "knowing and intelligent" where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right, and a waiver is "voluntary" where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception. ...

Thai v. Mapes, 412 F.3d 970, 976-77 (8th Cir.), cert. denied, 546 U.S. 1039 (2005).  Whether or not a confession is made freely and voluntarily must be determined in light of the totality of the circumstances.  See United States v. Hyles, 479 F.3d 958, 966 (8th Cir. 2007); Harper, 466 F.3d at 643; United States v. Annis, 446 F.3d 852, 855 (8th Cir. 2006), cert. denied, 551 U.S. 1163 (2007).

Based on the facts presented at the hearing, the Court finds that defendant Crisolis-Gonzalez was read aloud a Spanish Miranda Waiver form.  (See Fact No. 10, supra)  Defendant signed the waiver and agreed to speak to Special Agent Covarrubias without a lawyer.  (Id.)  However, defendant said that he would rather wait and talk after he was taken away from the apartment when the other people were not around.  (Id.)  Defendant was taken to the Platte County Jail where he was re-advised of his Miranda rights and signed the form again.  (See Fact No. 12, supra)  The interview of defendant took place after defendant signed the Miranda Waiver.  (Id.)

Contrary to defendant's argument that he gave a statement "[i]n response to law enforcement's statements that Mr. Crisolis was looking at a mandatory five years and if he helped law enforcement he'd be working off five years,"[2] the evidence presented at the hearing was that no such statement was made to defendant.  Rather, Special Agent Covarrubias merely told Crisolis-

---

[2](Defendant's Motion to Suppress Evidence and Statements (doc #59) at 3)

Gonzanes that if he cooperated, the U.S. Attorney's Office would be informed of his cooperation. (See Fact No. 10, supra) Further, defendant argues that the Miranda warnings were ineffective as they came after he had made unwarned incriminating statements. (Defendant's Motion to Suppress Evidence and Statements (doc #59) at 8) However, the only incriminating statements made by defendant prior to receiving Miranda warnings were defendant's acknowledgment that he was in this country illegally (which the agents already knew) and defendant's volunteered statement that he had a gun under his mattress (which was not made in response to any question by the agents). Neither of these statements negate the effectiveness of later Miranda warnings which were given to defendant prior to being interviewed by Special Agent Covarrubias.

Viewing the totality of the circumstances, the Court finds that defendant Crisolis-Gonzalez was fully advised of his rights, that he understood his rights and that he voluntarily and intentionally waived those rights and agreed to talk to Special Agent Covarrubias.

      F.     A Later Interview

In defendant's motion to suppress, he references a later interview that took place on either May 17, 2010 (see doc #59 at 9) or May 18, 2010 (id. at 3). Defendant argues that any statements he made during this interview should be suppressed as he had not been brought in front of a magistrate judge as required by statute. (Defendant's Motion to Suppress Evidence and Statements (doc #59) at 9) No evidence was presented at the suppression hearing regarding any interview on May 17 or May 18. Therefore, defendant's request to suppress any statements made during an interview on May 17 or 18 is denied.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting in part and denying in part Defendant's Motion to Suppress Evidence and Statements (doc #59). The motion is granted to the extent it seeks suppression of defendant's acknowledgment that he was in this country illegally. The remainder of the motion is

denied.

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

_____/s/ Sarah W. Hays_____
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE
